UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MCI, LLC d/b/a VERIZON BUSINESS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:06-cv-00945-DFH-JMS |
| | ) |
| PATRIOT ENGINEERING | ) |
| AND ENVIRONMENTAL, INC., | ) |
| | ) |
| Defendant. | ) |

ENTRY ON LOSS OF USE DAMAGES

Plaintiff MCI, LLC does business as Verizon Business ("Verizon") and operates a telecommunications network of fiber-optic cables. Defendant Patriot Engineering and Environmental, Inc. ("Patriot") damaged one of Verizon's high-capacity underground cables while performing drilling operations for Indiana's highway department. Verizon quickly rerouted much of the telecommunications traffic through other cables and repaired the damaged cable in a little more than eight hours. The repairs cost approximately $22,000. In this diversity action, plaintiff Verizon seeks both those repair costs and an additional award of $633,596 for the loss of use of its cable during the hours needed to repair it. Defendant Patriot seeks partial summary judgment on the issue of loss of use damages. Patriot has agreed that Verizon is entitled to recover some reasonable amount for loss of use damages for the hours that it took to repair the cable. The disputed issue is how to measure the value of that loss of use.

Verizon seeks to measure its loss of use by what it claims it would have cost to rent replacement fiber-optic capacity for a few hours on the open market, though Verizon did not actually rent any replacement cable capacity. As explained below, Verizon is not entitled to measure the value of its loss of use as it proposes. Verizon has failed to come forward with evidence that there is a functioning rental market for comparable facilities for such a short term. More than 98 percent of the claimed rental cost, $624,000 of a total of $633,596, consists of one-time installation fees that a third-party provider charges for the setup of one-year rental contracts for high-capacity telecommunications cables. Awarding loss of use damages based primarily on those one-time charges for such different hypothetical rental transactions would be unreasonable as a matter of law. Such an award would amount to an improper windfall under Indiana law and would be unfair in the absence of a market for short-term rental of comparable facilities.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only genuine disputes over

-2-

material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Id.*

Patriot's motion for summary judgment asserted initially that Verizon has no evidence that would support any award of loss of use damages at all. Patriot has since conceded that some loss of use damages may be appropriate. Patriot still contends that loss of use damages could not reasonably be based on the one-time charges that are part of cable rental transactions for one year or more. Under Indiana law, it is the plaintiff's burden to prove damages. *Shepard v. State Automobile Mutual Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006), citing *Lincoln National Life Insurance Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985). As a matter of summary judgment practice, Patriot's motion takes advantage of the holding in *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party may prevail by pointing out the lack of evidence on an issue, like damages here, as to which the non-moving party bears the burden of proof.

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment). "[B]ecause summary judgment is not a paper

trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court must view the evidence in the light reasonably most favorable to the non-moving party, giving it the benefit of conflicts in the evidence and the most favorable reasonable inferences.  *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).  Accordingly, the factual statements in this decision are not necessarily accurate but reflect the evidence in light of the summary judgment standard.

*Facts For Summary Judgment*

Patriot is an engineering firm that provides geotechnical, environmental, and construction materials testing services.  Patriot had a contract with the Indiana Department of Transportation to perform geotechnical engineering services throughout Indiana.  On September 13, 2005, as a part of the agreement, Patriot conducted foundation exploration soil borings near County Road 700 West and US 52 (Brookville Road) in Hancock County.  The soil borings were taken in connection with roadway improvements scheduled for US 52.  While conducting these soil borings, Patriot damaged a fiber-optic telecommunications cable owned and operated by Verizon.

Verizon operates a telecommunications network that relies on many underground fiber-optic cables like the one that Patriot damaged.  These cables

carry telecommunications traffic between various terminals on Verizon's network. The high-capacity cable that Patriot damaged contained 48 separate optical fibers and ran between Verizon's terminals in Pleasant View, Indiana and Waynesville, Ohio. One pair of fiber-optic cables could carry up to 32 OC-192 transport systems. An OC (optical carrier) transport system converts electrical signals into optical signals that can then be carried over fiber-optic cables in the form of light. The capacity of a fiber-optic cable is measured in "DS-3" units. One DS-3 is the equivalent of 672 individual telephone calls. An OC-192 transport system can carry 192 DS-3s, an OC-48 transport system can carry 48 DS-3s, etc. Since a pair of fiber-optic cables is capable of carrying up to 32 OC-192 transport systems, the cable that Patriot damaged, which had 24 pairs of cables, could potentially carry 768 OC-192 transport systems. This is a capacity of 147,456 DS-3s, or the equivalent of 99,090,432 individual telephone calls.

At the time the cable was damaged, Verizon was using less than one half of one percent of the cable's theoretical maximum capacity. Only thirteen OC-48 transport systems were "lit, active, and impacted." This is a capacity of 624 DS-3s, equivalent to 419,328 individual telephone calls. Verizon has based its claim for loss of use damages on only this capacity that was actually in use at the time of the accident.

Within approximately one minute after Patriot damaged the cable, Verizon was able to restore 296 DS-3s by rerouting them automatically to spare capacity

on other cables in Verizon's network.  Verizon was able to restore another six DS-3s by rerouting them manually to spare capacity on other cables in Verizon's network within approximately two hours and 36 minutes.  Verizon was able to repair the cable and restored the remaining 322 DS-3s approximately eight hours and 27 minutes after Patriot had damaged the cable.  Approximately 3,900 switched calls were blocked or interrupted as a result of the damage to the cable. Verizon received complaints from at least 57 separate customers that their dedicated service was interrupted.

Verizon now seeks more than $655,000 in damages from Patriot.  This sum includes $6,250 in labor costs paid to an outside contractor and $15,624 in costs of Verizon's own employees for work to physically repair the cable.  Patriot's summary judgment motion does not challenge those charges.

Verizon also seeks loss of use damages based on what it claims it would have cost it to rent 624 DS-3 lines for 8.23 hours (the time calculated by Verizon). To determine the cost of renting cable capacity sufficient to replace the transport systems affected by the damaged cable, Verizon consulted the published tariff schedules of Level 3 Communications, Inc. ("Level 3") and Qwest Communications Corporation.  See Supplemental Decl. of Tooley, Exhibits C & D (Docket No. 43). Level 3 also operates a nationwide fiber-optic network.  Its rate for comparable capacity consists of a monthly recurring charge of $1,345.34 per DS-3 and a one-time installation charge of $1,000 per DS-3.  During oral argument on Patriot's

motion, Verizon verified that the minimum rental period that Level 3 offers is one year.  In calculating the hypothetical rental rate, Verizon pro-rated the $1,345.34 per month charge to an hourly rate of approximately $1.87 per DS-3.  Verizon did not pro-rate the installation fee.  The pro-rated hourly rate was then multiplied by the 8.23 hours that it took to repair the cable and then again by the 624 DS-3 lines that were affected.  This yielded a cost of approximately $9,596 for the recurring part of the rental rate.

Verizon then added to this amount the one-time $1,000 installation fee for each of 624 DS-3 lines, for an additional $624,000.  Verizon claims a total hypothetical rental cost of $633,596.  Verizon did not actually rent this capacity from Level 3 but instead used its own spare capacity to reroute as many of the DS-3s as it could before the physical repairs were complete.[1]

Operators of telecommunications networks like Verizon can anticipate that they will experience equipment failures of various kinds for various reasons, including damage to buried cables.  Customers place a high value on reliable communications that are always available.  As a result, Verizon and other

---

[1]The tariff charges for Qwest were considerably higher than those for Level 3.  Verizon has relied on only the lower Level 3 charges.  However, Verizon has used the Level 3 charges for renting DS-3 lines one at a time, rather than the higher capacity OC-48 lines.  Applying Verizon's methodology to the Level 3 tariff for 13 OC-48 lines, the comparable figures would appear to be a pro-rated usage charge of $1,268 for 8.23 hours, and one-time connection fees of $32,500.  Neither Verizon nor Patriot has addressed this issue, so the court focuses on the much higher figures actually argued by Verizon.

competitors have built redundant capacity into their networks, and their equipment can quickly reroute traffic in the event of a cable interruption. Such events nevertheless put additional strain on the network and impose higher risks in the event of damage to the alternate route. Additional facts are noted below as needed, keeping in mind the standard applicable to a motion for summary judgment.

*Discussion*

The parties have now agreed that Verizon is entitled to some compensation for loss of use of its property. Although damages for loss of use are often measured in terms of rental value, the undisputed evidence here shows that there is no comparable rental market. Verizon's claim for $633,596, based primarily on $624,000 in one-time rental charges from the Level 3 tariff for one-year cable rentals, does not provide a reasonable basis for calculating the value of the lost use. Such an award would produce an improper windfall that should not be available under Indiana law.

I.   *Loss of Use for Damaged Property*

Indiana law governs Verizon's claims. Under Indiana law, where there is damage to personal or real property, an award of damages based on the reasonable value of the temporary loss of use of the property is proper. *Hamacher v. Decker Livestock, Inc.*, 536 N.E.2d 304, 305 (Ind. App. 1989), citing

*Persinger v. Lucas*, 512 N.E.2d 865, 868 (Ind. App. 1987), and cases cited therein; see also *Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*, 773 F.2d 783, 793-95 (7th Cir. 1985) (applying Indiana law to loss of public utility's electrical generating capacity); Restatement (Second) of Torts § 928 and comment b (1979) (damages for harm to chattels include compensation for loss of use).

Loss of use damages may be awarded even where the aggrieved party does not rent a replacement, or if she mitigates damages by substituting other property in her possession for the damaged property. *E.g., Hamacher*, 536 N.E.2d at 305 (automobile owner entitled to loss of use damages based on fair rental value of damaged vehicle despite the fact that he did not actually rent a car to replace the vehicle, but instead borrowed a substitute vehicle from his wife); *New York Central Railroad Co. v. Churchill*, 218 N.E.2d 372, 377 (Ind. App. 1966) (affirming loss of use award for reasonable rental value of destroyed tractor-trailer unit for time needed to obtain replacement, even where owner did not actually obtain a replacement); accord, Restatement (Second) of Torts § 931 and comments b and c (damages for detention or preventing use of land or chattels include value of use for the period the property was not available for use, even if owner did not actually rent a substitute or lose actual use).

In this case, Verizon has come forward with evidence that it built separate, spare, dedicated restoration capacity on other cables in its network which it reserved for use in emergencies like Patriot's severing of its main working fiber-

optic cable.  Patriot therefore has agreed that loss of use damages are available to Verizon in this situation.   See Def Br. at 12 ("These [rental] costs, while susceptible to closer inspection, seem reasonable; however, the additional damages of $624,000 are not.").  During the hearing, Patriot confirmed that it agreed that loss of use damages are appropriate in this case.[2]

---

[2]This concession is reasonable in light of the evidence here, at least for purposes of summary judgment.  The concession is also consistent with two "spare boat" admiralty cases discussed in many recent cases involving damaged communication cables.  Compare, *e.g.*, *MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.*, 2006 WL 3542332, at *7 (N.D. Ill. Dec. 6, 2006) and *MCI WorldCom Network Services, Inc. v. Kramer Tree Specialists, Inc.*, 2003 WL 22139794, at *2 (N.D. Ill. June 19, 2003), with *MCI Worldcom Network Services, Inc. v. W.M. Brode Co.*, 413 F. Supp.2d 868, 874 (N.D. Ohio 2005) and *MCI Worldcom Network Services, Inc. v. Lind*, 2003 WL 24304128, at *3-4 (S.D. Fla. Feb. 27, 2003).

In both *The Cayuga*, 5 F. Cas. 326 (E.D.N.Y. 1868), *aff'd*, 5 F. Cas. 329 (C.C.E.D.N.Y. 1870), *aff'd*, 81 U.S. 270 (1871), and *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170 (1932), a plaintiff sought damages for loss of use of a negligently damaged boat.  In each case, the owner of the boat did not actually rent a replacement while the damaged boat was being repaired.  The plaintiff in *The Cayuga* was permitted to recover loss of use damages while plaintiff in *Brooklyn Terminal* was not.  The different results are explained by the functions that the substitute boats served in the plaintiffs' businesses.  In *The Cayuga*, the plaintiff had acquired the substitute boat for the sole purpose of providing a substitute in case of damage to one of the main boats of the fleet.  In *Brooklyn Terminal*, the plaintiff used other boats in its regular working fleet overtime to cover for the missing damaged boat.  Verizon has come forward with evidence that it acquired and built its spare capacity for emergency use.  For purposes of summary judgment, this case therefore appears to be closer to the spare boat in *The Cayuga*, and Verizon is entitled to recover reasonable loss of use damages.

-10-

II.    *Measuring the Loss of Use*

The principal issue is how to measure Verizon's loss of use damages.  There have been numerous cases in recent years with similar claims for damage to telecommunications cables.  Some courts have allowed damages for loss of use.[3]  Others have rejected loss of use damages.[4]  Counsel and the court in this case are not aware of other cases that address specifically the role of one-time rental charges from a hypothetical transaction in measuring loss of use damages, especially where those charges make up a substantial portion of the claimed rental value.  Those charges make up more than 98 percent of the claimed rental value in this case.

---

[3]See, *e.g.*, *MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.*, 2006 WL 3542332 (N.D. Ill. Dec. 6, 2006); *MCI WorldCom Network Services, Inc. v. Pelcrete Constr. Inc.*, 2006 WL 1388490 (S.D.N.Y. May 8, 2006); *MCI WorldCom Network Services, Inc. v. Kramer Tree Specialists, Inc.*, 2003 WL 22139791 (N.D. Ill. Aug. 15, 2003); *MCI WorldCom Network Services, Inc. v. Kramer Tree Specialists, Inc.*, 2003 WL 22139794 (N.D. Ill. June 19, 2003); *MCI WorldCom Network Services Inc. v. OSP Consultants, Inc.*, 2002 WL 32166536 (N.D. Okla. Nov. 20, 2002); *MCI WorldCom Network Services Inc. v. Von Behren Elec., Inc.*, 2002 WL 32166535 (N.D. Ga. May 21, 2002); *AT&T Corp. v. Lanzo Construction Co.*, 74 F. Supp. 2d 1223 (S.D. Fla. 1999).

[4]See, *e.g.*, *MCI Worldcom Network Services, Inc. v. W.M. Brode Co.*, 413 F. Supp. 2d 868 (N.D. Ohio 2005); *MCI Worldcom Network Services, Inc. v. Mastec, Inc.*, 2003 U.S. Dist. LEXIS 10757 (S.D. Fla. Mar. 13, 2003); *MCI Worldcom Network Services, Inc. v. Lind*, 2003 WL 24304128 (S.D. Fla. Feb. 27, 2003); *Southwestern Bell Telephone Co. v. Harris Co. of Fort Smith*, 109 S.W.3d 637 (Ark. 2003); *MCI Worldcom Network Services, Inc v. OSP Consultants, Inc.*, 585 S.E.2d 540 (Va. 2003); see also *MCI Worldcom Network Services, Inc. v. Glendale Excavation Corp.*, 224 F. Supp. 2d 875, 880-81 (D. N.J. 2002) (denying plaintiff's motion for partial summary judgment on the issue of damages; although "MCI will most likely be entitled to loss of use damages . . . the rental value of a substitute cable may not be an appropriate measure of those damages").

Under Indiana law, the value for loss of use is often measured by the reasonable rental value of the property in the market area.  See *Persinger*, 512 N.E.2d at 868, citing *Universal C.I.T. Credit Corp. v. Shepler*, 329 N.E.2d 620, 629 (Ind. App. 1975) (Garrard, J., concurring); *Oceana Oil Producers v. Portland Silo Co.*, 100 N.E.2d 895, 898 (Ind. 1951); *Shelbyville Lateral Branch Railroad Co. v. Lewark*, 4 Ind. 471 (1853);  *Maddox v. Yocum*, 52 N.E.2d 636, 639 (Ind. App. 1944).  Rental value is not the only measure, however.  Loss of use also may be measured by lost profits when they are sufficiently ascertainable.  *Ashland Pipeline Co. v. Indiana Bell Telephone Co.*, 505 N.E.2d 483, 490 (Ind. App. 1987) (awarding loss of use damages to telephone company based on lost profits where underground telephone cable was negligently severed); *Persinger*, 512 N.E.2d at 868, citing *Jerry Alderman Ford Sales, Inc. v. Bailey*, 291 N.E.2d 92, 105 (Ind. App. 1972) (noting that "any measure of damages must be flexible enough to vary with the necessities of the situation"); *Weddle v. I.R.C. & D. Warehouse Corp.*, 85 N.E.2d 501, 503 (Ind. App. 1949) ("'in cases involving the deprivation of the use of property, the damage is its rental value, if it has a rental value, but, if not, then the value of its use to the injured party for the time he was deprived of its use is the measure of damages'"), quoting *Fisher v. Carey*, 119 N.E. 376, 378 (Ind. App. 1918) (proper measure of loss of use of private telephone line was worth of line to owner, not rental value).

In this diversity action the court applies the substantive law of Indiana as it believes the Supreme Court of Indiana would apply it were this issue before it.

*State Farm Mutual Automobile Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001), citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 80 (1938).  The court predicts that the Indiana Supreme Court would not woodenly apply the rental value method to impose the absurdly high rent that Verizon seeks based on one-time charges from long-term rentals that are not fairly comparable to the short-term loss of use in this case.  The difficulty comes when the "convenient rule of thumb is sought to be applied to every case regardless of the circumstances." *New York Central R. Co. v. Churchill*, 218 N.E.2d at 432, quoting *Guido v. Hudson Transit Lines*, 178 F.2d 740, 742 (3d Cir. 1949).

Verizon has not directed the court's attention to cases from Indiana, or from other jurisdictions, addressing how rental value might be determined where a substantial amount of the supposed rental value for a short term consists of one-time charges that the plaintiff never actually incurred.  Indiana cases on rental value have most often involved real estate, automobiles, or other vehicles or business equipment.   See, *e.g.*, *Oceana Oil Producers*, 100 N.E.2d at 898 (farmland); *Shelbyville Lateral Branch Railroad*, 4 Ind. 471 (wagon); *Persinger*, 512 N.E.2d at 868 (automobile); *Jay Clutter Custom Digging v. English*, 393 N.E.2d 230, 235 (Ind. App. 1979) (apartment buildings); *Weddle*, 85 N.E.2d at 503 (tractor-trailer); *Maddox*, 52 N.E.2d at 639 (filling station); *New York Central Railroad Co. v. Reidenbach*, 125 N.E. 55, 56 (Ind. App. 1919) (farm equipment needed in threshing season).  In all of these cases, it is apparent that the courts assumed the plaintiff could have rented a reasonable substitute, or in the case of

real estate, a market rental value could be estimated with fair certainty.  The cases therefore provide little specific guidance for circumstances like those presented here, where the one-time transaction charges for a hypothetical rental dwarf the periodic rental charges for actual use of the property in question.

The Seventh Circuit has noted that Indiana loss of use cases involving real property and damaged automobiles offer limited guidance in cases involving facts far removed from those circumstances.  In a case involving an electrical utility company's attempt to recover damages under Indiana law based on loss of use of electrical generating power, the Seventh Circuit wrote:

> The parties have made various (to us confusing) arguments about the appropriate measure of damages for loss of use, particularly with respect to what constitutes adequate proof of rental value.  This confusion stems at least in part from the parties' valiant attempts to conform statements in Indiana cases about rental value as applied to such things as land or automobiles to the peculiar circumstances of an electric utility which loses generating capacity.

*Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*, 773 F.2d 783, 793-94 (7th Cir. 1985).  The court concluded that where the utility's lost capacity was committed to off-system sales, the appropriate measure for loss of use would be the lost profits from such off-system sales.  *Id.* at 795.[5]

---

[5]The court also found that loss of use could be measured by the cost of replacing the lost generating power by buying it from neighboring utilities or by the increased operating cost of using PSI's own less efficient plants to generate the missing capacity.  *Public Service Co. of Indiana v. Bath Iron Works*, 773 F.2d at 794.  The court clearly understood that there was a functioning market for such

(continued...)

Similarly here, the court must keep in mind the Indiana appellate court's more general teaching that "any measure of damages must be flexible enough to vary with the necessities of the situation." *Jerry Alderman Ford Sales, Inc. v. Bailey*, 291 N.E.2d 92, 105 (Ind. App. 1972).  The problem with Verizon's damages theory in this case is that there simply is no evidence of a market for comparable short-term rentals of telecommunications cables.  The evidence of Level 3's tariff for cable rental shows that such rentals are for at least one year.  See Supplemental Decl. of Tooley Ex. C (Docket No. 43).  For a one-year rental, the one-time connection charge of $1,000 would amount to less than 6 percent of the total charges for the year.[6]  There is no evidence from Verizon, which bears the burden of proof on the issue of loss of use damages, that anyone actually rents DS-3 cables for a few hours, a few days, or even a few weeks at a time, such that the one-time connection charges amount to a substantial portion of the total charges, let alone to the more than 98 percent that Verizon seeks here.

Where one-time charges dwarf the periodic rental fees, the underlying assumptions of the automobile, truck, tractor, and real estate cases that use rental value to measure loss of use no longer apply.  Applying Verizon's proposed measure of damages here would be akin to applying principles of Newtonian physics to an object whose velocity approaches the speed of light.

---

[5](...continued)
short-term power sales between different utilities.  See *id.* at 795 (referring to "inter-utility capacity and energy charges").

[6]Assuming the minimum monthly usage fee of $1,345, times 12 months, plus the $1,000 connection fee.

-15-

Two admiralty cases from the nineteenth century made explicit the basic assumptions that ordinarily support use of rental value to measure the value of lost use.  In *The Conqueror*, 166 U.S. 110 (1897), ship owner Frederick Vanderbilt sought loss of use damages from the United States for the wrongful seizure and detention of his 372-ton pleasure yacht as part of a dispute over whether the British yacht was subject to U.S. import tariffs.  The district court's damage award included $15,000 for loss of use, measured at $100 per day through the autumn and winter.  See 166 U.S. at 125.[7]

On appeal, the Supreme Court reversed the damage award.  The Court acknowledged that some loss of use damages might have been allowable, at least in theory.[8]  The Court actually held, however, that charter (rental) value was not the proper measure of those damages where there was no real rental market for such a vessel as the huge private yacht.  The Court recognized that rental value was usually the best measure of loss of use, but explained that "this criterion

---

[7]Vanderbilt was represented in the case by future Secretary of War, Secretary of State, and Nobel Peace Prize winner Elihu Root, whom lawyers also remember for having said:  "About half of the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop."  1 Jessup, Elihu Root 133 (1938), quoted in *Hill v. Norfolk & Western Ry. Co.*, 814 F.2d 1192, 1202 (7th Cir. 1987).

[8]The Westlaw® service has "red-flagged" *The Conqueror* based on statements in *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 175 (1932), disapproving of statements in *The Conqueror* that seemed to bar any claim for loss of use of a pleasure vessel, and identifying such statements as *obiter dicta*.  The LEXIS® service notes only that *Brooklyn Eastern* "explained" *The Conqueror*.  In any event, *The Conqueror* offers persuasive guidance for the points cited here on the proper measure of loss of use damages as this court tries to predict Indiana law as applied to this case.

cannot be often applied, as it is only in the larger ports that there can be said to be a market price for the use of such vessels." *The Conqueror*, 166 U.S. at 127. In the absence of a meaningful market price for rental, the Court found that lost profits were a more reliable way to measure loss of use:

> In the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner, showing her earnings about the time of her collision, are competent evidence of her probable earnings during the time of her detention.

*Id.*  The Court noted in *The Conqueror* that a similar issue had arisen in *The Cayuga.  Id.* at 128-29.  There too the courts allowed the plaintiff to recover loss of use damages but did not measure those damages by rental value.  As in *The Conqueror*, the court in *The Cayuga* found that rental value was not an appropriate measure for loss of use where there was no rental market for the type of boat owned by the plaintiff:

> For the use of vessels of this class there is no such thing as a market price fixed by various transactions between various persons.  Ferry-boats are not general ships, up for charter or hire in open market, and it is impossible to refer to any such market to show the value of the use of such a vessel at the time in question.

*The Cayuga*, 5 F. Cas. 326, 327 (E.D.N.Y. 1868).  The *Cayuga* court explained that the general rule of measuring the value of loss of use by rental value

> can only be intended to be applied in cases where there is such a market to refer to, but not in a case where it is made to appear that no such thing as a market price exists.  In the absence of a market price to refer to, some other evidence must be allowable in a case like this . . . .

*Id.*

Those observations apply here. What was missing in *The Conqueror* and *The Cayuga* is also missing in this case. Verizon's argument that the proper measure of its loss of use damages is the reasonable rental cost of replacement capacity assumes that there is a functioning rental market that can supply evidence of a reasonable rental cost for facilities comparable to those it could not use for eight hours. As in *The Cayuga* and *The Conqueror*, however, the undisputed facts here show that there is no such market for comparable rentals. In *MCI Worldcom v. Lind*, Judge Jordan of the Southern District of Florida pointed out in similar circumstances: "No party in MCI's position, whether wealthy or destitute, would have reasonably considered renting a replacement transmission system . . . ." *Lind*, 2003 WL 24304128, at *3. One of the reasons why the actual rental of replacement capacity would never take place in practice is that the time required to secure such replacement capacity would be longer than the time required to repair the damage to Verizon's cable. The fact that Level 3 charges a $1,000 one-time installation fee for each DS-3 with a one- year minimum contract indicates that its business is not designed to provide customers like Verizon with 624 DS-3 lines for eight hours. As in *The Cayuga*, the "difficulty in this particular case arises from the peculiarity of the business and the want of demand" for what the plaintiff is seeking to rent. 5 F. Cas. at 330.

Keeping in mind Judge Cardozo's caution that "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it," *Berkey v. Third Ave. Railway Co.*, 155 N.E. 58, 61 (N.Y. 1929), two examples may help illustrate the inequity that would result if the court accepted Verizon's argument and measured rental value with transaction terms intended for much longer-term rentals, especially where one-time charges would dwarf the periodic charges for the short term of a few hours that is actually in dispute.

First, consider an apartment rental market in a university town where only one year leases are available. A tenant seeks loss of use damages in that market because a gas leak or some other wrong prevented him from occupying his apartment for eight hours. It would be unfair, even absurd, to measure the value of that loss of use by adding to a pro-rated lease the first month's rent, last month's rent, security deposit, and other one-time fees associated with actually renting an apartment for a year. If there is no functioning market for hourly rentals for apartments, one could not reasonably base the measure of value on the terms of a much longer rental where one-time charges would overshadow the periodic rental charge.

Or consider an automobile case in which the hypothetical short-term rental would also involve high one-time charges. Suppose an expensive Italian sports car suffers minor damage requiring eight hours for repairs, and suppose there is no actual rental possible in the area on short notice for such a short term.

-19-

Suppose the only way to rent the same model in a hurry is to have one shipped by air from the factory in Italy.  The owner does not actually rent a substitute, but claims rental value as a measure for loss of use for eight hours.  It would be unfair, even absurd, to measure the value of the loss of use by rental cost including the hypothetical air freight charges.  It would not be reasonable to rent a substitute on those terms, meaning that there is no functioning rental market for a comparable substitute if those one-time fees are included in the terms.

Similarly here, it would be unfair and even absurd to measure the value of Verizon's loss of use for eight hours by including one-time fees totaling $624,000 that are intended for rental contracts lasting at least one year.  Rental value is an inappropriate measure of loss of use in this case because there is no functioning rental market for renting 624 DS-3 cables for eight hours.  Damages cannot be based on mere speculation and conjecture.  *Shepard v. State Automobile Mutual Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006) (applying Indiana law), citing *Fowler v. Campbell*, 612 N.E.2d 596, 603 (Ind. App. 1993), and *Turbines v. Thompson*, 684 N.E.2d 254, 258 (Ind. App. 1997).  Basing the value of loss of use on a non-existent market would amount to just such speculation.  Accord, *The Conqueror*; *The Cayuga*.

Verizon's proposed measure for loss of use damages runs contrary to basic principles of Indiana law of damages.  In Indiana, as elsewhere, "the law disfavors a windfall."  *McGehee v. Elliott*, 849 N.E.2d 1180, 1191 (Ind. App. 2006), quoting

*INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. App. 2003); *Purcell v. Southern Hills Investments, LLC*, 847 N.E.2d 991, 1002 (Ind. App. 2006). Including the high one-time charges in measuring the value of Verizon's loss of use would essentially amount to a windfall for Verizon. "The aim of compensatory damages . . . is not to penalize either party, rather it is to indemnify the injured party for the loss sustained." *D & T Sanitation, Inc. v. State Farm Mutual Automobile Insurance Co.*, 443 N.E.2d 1207, 1209 (Ind. App. 1983) (loss of use damages not allowed where sanitation company was able to immediately replace damaged truck-packer unit and the company lost neither customers nor profits as a result: "To allow recovery beyond the injury actually suffered would provide a windfall . . . .").

As a general rule, where a legal injury is of an economic character, the proper level of compensation is equal to the injury sustained so that the injured party is placed as near as possible in the situation he would have occupied if the wrong had not been committed. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975), citing *Wicker v. Hoppock*, 73 U.S. 94, 99 (1867). Indiana courts follow this general rule, recognizing that although an injured party should be fairly compensated, it should not be placed in a better position. *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d at 577, citing *Wiese-GMC, Inc. v. Wells*, 626 N.E.2d 595, 597 (Ind. App. 1993), and *Potts v. Offutt*, 481 N.E.2d 429, 434 (Ind. App. 1985). This rule avoids the inequitable result of awarding a windfall to an aggrieved party. The purpose of any award of damages is to compensate the

injured party fairly and adequately for the loss sustained.  *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind. 2000); *Terra-Products, Inc. v. Kraft General Foods, Inc.*, 653 N.E.2d 89, 93 (Ind. App. 1995).  An award of loss of use damages to Verizon based on the $624,000 in one-time charges for hypothetical cable rentals would run afoul of these principles.

Verizon argues that high damage awards against errant drillers and excavators are needed to put economic pressure to force companies like Patriot to drill and dig more safely.  However, as Judge Learned Hand implied long ago, safety has its costs, and it is possible to pay for too much safety.  See *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d. Cir. 1947); see also *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1025-26 (7th Cir. 1982) (encouraging use of Hand formula).  Applying the famous Hand formula[9] to the facts of this case, the magnitude of the harm (L) is relatively small because spare capacity is available to mitigate cable damage very quickly, and physical repairs can be accomplished in a matter of hours.  Verizon is correct that requiring drillers and excavators to pay in excess of $655,000 in a case like this one, where out-of-pocket losses are much smaller, would cause them to be

---

[9]Judge Hand's formula is a balancing test used to determine the standard of care applied to a claim of negligence.  The test compares B with PL, where B is the burden of precaution and PL is the probability of harm (P) multiplied by the magnitude of the harm (L).  Under the Hand formula, an actor is negligent only where B<PL, that is, where the cost of precautions is less than the harm if the accident occurred discounted by the probability that it would occur.  The formula offers a method for evaluating the optimal level of precaution society should require of a potential tortfeasor.  See generally Richard A. Posner, *Economic Analysis of Law* 168-69 (6th ed. 2003).

more careful in drilling and digging. Being more careful has costs, however, which would be paid through increased premiums for insurance to cover the cost of such enormous damage awards. These costs would be passed on to customers in the form of higher drilling and excavation costs, such as for drilling services to build and maintain highways.

The Hand formula does not always lend itself to precise calculations. *U.S. Fidelity & Gauranty Co.*, 683 F.2d at 1026. However, given the court's conclusion that awarding Verizon loss of use damages on the order of $633,000 would amount to a windfall under Indiana law and would be grossly unfair and improper in the absence of a functioning rental market, the court has no difficulty in concluding that such an award would be inefficient in the larger, economic picture. It would essentially amount to purchasing too much safety.

Finally, Verizon argues that the determination of a reasonable award for loss of use should be left to a jury, so that a jury could weigh the competing arguments and the probative value of the Level 3 tariff charges, for example. Within reasonable bounds, that ultimate determination of any loss of use damages will be left to the jury. On this record, however, the damages Verizon seeks are far outside reasonable bounds. The theory based on the high one-time installation

charges could not produce a reasonable award, so summary judgment on the issue is warranted.[10]

*Conclusion*

For the reasons stated above, Patriot's motion for partial summary judgment (Docket No. 31) is granted in part.  Verizon is entitled to recover damages for the loss of use of its cable severed by Patriot.  Verizon is not entitled to include in the measure of that lost use the one-time installation charge of $1,000 per DS-3, at least without reasonably pro-rating those charges.

So ordered.

Date: May 17, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

---

[10]The Indiana legislature has adopted legislation governing damage to underground facilities, including telecommunications cables.  Indiana Code § 8-1-26-20 provides that "a person responsible for an excavation or demolition operation . . . shall . . . plan the excavation or demolition to avoid damage to or minimize interference with underground facilities in and near the construction area."  Section 8-1-26-22 provides that "if an operator suffers a pecuniary loss as a result of a violation of this chapter, the operator may bring a civil action against the person who caused the loss for . . . an amount equal to the operator's *actual damage to the facility*."  (Emphasis added.)  Neither MCI nor Patriot has made an issue of the proper interpretation of the statute's language, "actual damage to the facility," nor have the parties raised any issue as to the relationship between the statute and the common law.

Copies to:

Cathy  Elliott
BOSE MCKINNEY & EVANS
celliott@boselaw.com

Anthony J. Jorgenson
HALL ESTILL HARDWICK GABLE GOLDEN & NELSON PC
ajorgenson@hallestill.com

Jeffrey Alan Musser
ROCAP WITCHGER
jam@rocap-witchger.com

James John Proszek
HALL ESTILL HARDWICK GABLE GOLDEN & NELSON PC
jproszek@hallestill.com

Scott Lee Timberman
ROCAP WITCHGER LLP
slt@rocap-witchger.com

James D. Witchger
ROCAP WITCHGER
jdw@rocap-witchger.com